May it please the court, Neil Walters for the appellant Jermarl Jones. The court has granted a certificate of appealability on a single issue, which is why the trial counsel was ineffective in failing to bring a motion to suppress evidence seized from an apartment. I'm going to refer to it as the apartment. There were a number of apartments, but it's the search of the breezy tree court apartment that's at issue. The district court rejected the claim on both prongs of the Strickland test and said it was not deficient performance and that there was no prejudice. Our position is both of those decisions were incorrect and the case should be reversed. On the question of deficient performance, I would suggest that that's a fairly straightforward question. The record as it presently exists is that counsel had a single strategic basis for the decision not to bring the motion to suppress, and that was if his client testified at the suppression hearing, that testimony could be used against him at trial. The Supreme Court held decades ago in Simmons that that was incorrect, that that testimony could not be used at the trial. Couldn't be used on the merits, but I think there's a possibility it could have been used to impeach him if he decided to testify. Your Honor, I'd have to say I'm not sure I've read a case that says, I don't know the government makes this sort of derivative use argument that they could have, but what it is clear that says it can't be introduced without, unless he doesn't object. So I think, Your Honor, to take Simmons at face value, even if he did testify and objected to it. Well, I'm not sure about that, but in any event, I think you're right that it certainly couldn't be used against them on the merits if he chose not to testify. Correct. And so on that issue, and I think Owens and Johnson and the Streeter cases are pretty clear that counsel is can't pursue a no connection strategy at trial because my client testified to a connection, the suppression hearing. Those courts have all ruled that that's deficient performance and the first prong of the Strickland test is satisfied. Under Kimmelman, when you get to the second prong of- Well, I guess the other problem is that's your client's version of the events. We just don't know because the attorney didn't submit an affidavit or there was no hearing, right? Well, certainly, I'm not sure that's my client's problem. I think that's the government's problem. I mean, it could have put on an affidavit. It could have said, we want to have an evidentiary hearing to put that in. But certainly, as the court looks at the record now, and as the court indicated in Nicholson, when there is no evidentiary hearing, the court is, I mean, to use the vernacular, sort of stuck with the evidence as it is. And the evidence at this point is that was the sole strategy. I mean, should the court remand it for an evidentiary hearing, I probably won't be trial counsel of that since I'm not licensed to practice in Maryland, but that would be an issue that would have to be taken up at that point. But right, given the record as it is. Well, is that a disposition that you'd be comfortable with? Well, it would certainly be my second choice, Your Honor, but we would prefer that the court rule in our favor on the merits. But I do think, right, at worst, the situation would be it should be sent back for an evidentiary hearing because I do think the court short-circuited that process. Again, I think perhaps more to the detriment of the government than to my client. It seems like to me that the argument you present is a viable one. The argument that the government presents is viable, but for the fact that it's a little short on the evidence. But it's difficult to make a firm conclusion based on the bare-bones affidavits that we have here. And that seems to me like part of the problem, which would be pretty easy to solve if you had an evidentiary hearing. I mean, maybe it would turn out the way the government says it would. Maybe it wouldn't. But it seems like a very easy problem to solve if you have a little evidence. Well, I would certainly agree, Your Honor. And that, I think, is both part of the problem here and certainly one solution. I'm trying to remember whether it's in the, I believe it was the Johnson case. And that's one of the, when the motion isn't broad at all, that is exactly the problem. We don't know what the evidence would have been at the suppression hearing, what the testimony would have been with respect to the issues of standing and those types of things. So I certainly do agree that an evidentiary hearing would solve the problem. I mean, to address, Your Honor, a specific question, I'm not sure, well, I guess if counsel appeared and testified ahead of a different strategy, that would then raise a different issue that the trial court would have to resolve. Didn't Judge Blake actually advise your client correctly at the suppression hearing about the consequences of his testifying at the motion stage? My client actually wasn't at that suppression hearing. She did. And I mean, that's one of the intriguing things in the record is the court at that point clearly properly advises a different defendant about the issues. And it may, if I remember the record correctly, it may have been, there was a second, so there's initial Wright-Butler suppression hearing. Then later, after my client is arrested, there is another suppression that his attorney brings. And I do remember in the record, there is a discussion with Judge Blake with a defendant. I just, honestly, at this point, I can't remember whether it was with my client in the second set. It seems a bit unlikely, given that counsel then goes on and doesn't bring the suppression, which I do believe it was in earlier in the Wright hearing. So, you know, I'm not disputing that the judge at a certain point was clearly aware of that. I mean, that was one of the things I sort of struggled with is, because you wouldn't know that from looking at the district court's final decision. I mean, there's no mention of Simmons. There's no mention of those issues. And that's, again, perhaps something- Well, I guess maybe given the murkiness of the record, Judge Agee's suggestion might be an appropriate one, that is to send this back and sort it out. Well, it certainly is. And I don't want to belabor the point if that's where things go. I would point out that when you get to the- I mean, where I was going earlier, Kimmelman says we both have to prove that the motion to suppress would have been meritorious and that the disposition of the underlying proceeding would be different. Again, those are issues that the court would presumably address at a second proceeding. I think those are, again, pretty easy to dispose of. I mean, first trial ended in a hung jury. The second trial, they couldn't convict on one of the two accounts. I think if the motion to suppress is successful, I think it's pretty clear that the outcome of the underlying proceeding would have been different. And certainly, the core issue on the second prong of Strickland is standing, which, again, probably my primary response to Judge Agee's question is, right, since he didn't have a hearing on his motion to suppress, there simply is no evidence on standing other than evidence from the co-defendant suppression hearing in which he was not present and unrepresented. So at a minimum, there should be a hearing where he could present that evidence. I do think, again, as we've set forth in the briefs, that the evidence such as it is would show that he does have standing. Part of my concern, Your Honors, is the court could simply send it back. I think it would perhaps be more beneficial with the court to send it back with some instructions that I do think there are some statements the trial court made in its decision which are simply legally incorrect or perhaps are given legally too much weight. For example, the issue of, well, you know, the name's not on the lease. There's a number of cases where leaseholders have reasonable or defendants have reasonable expectations of privacy, even though their names aren't on the lease. And we've cited those cases in our briefing. Well, particularly in this case where other defendants won their motions, their names weren't on the lease, were they? No, that's correct, Your Honor. It makes no sense. I think it's pretty clear if he had standing what the outcome would be. Absolutely. And for the court to have said previously, that doesn't matter, but now it does. I thought the reason primarily for the earlier result was the fact that the government made an injudicious concession. That's the standard. Well, certainly that is how appellate counsel would characterize that. It is true that the government conceded standing, whether it was injudicious or even incorrect. Well, yeah, they characterize it as... Certainly. It is another matter. But, right. And we don't dispute that on standing, you know, there was no evidence on our client's issues of standing. But if the court gets past standing, I think it's appropriate. In fact, the fact that your name is not on the lease is not dispositive of the issue of standing. You know, in Olson, another... We don't know what the evidence is going to be when the case goes back. And I'm always wary of telling district courts in advance, this is how you should rule, and we don't know what the evidence is going to be. And I would not invite that, Your Honor. It was simply, I think, some things the court has said. For example, it seemed to say that absence of the name from the lease was almost dispositive. It also seemed to say that not having a key when he was arrested was dispositive. The Supreme Court in Olson deals precisely with the key. And the government's arguing there that, well, he didn't have a key, and says, you know, the fact that he doesn't have a key is not dispositive or determinative. And the cases that say not being on the lease is dispositive. You know, again, perhaps not instructions, but to point out to the trial court that absence of name from the lease and not having a key, the Supreme Court and other courts of appeals have said are not determinative or dispositive of the issue. Otherwise, the court may find we go back, we get that evidence, we have a hearing, and we're back up again on those same issues with the trial court saying, well, didn't have a key, and that's determinative. And... Counselor, I think you're being very magnanimous. I think that's why we're here. It's why we're interlocutory appeals, to give direction. And I understand your point. Well, I court for trial judge, so I try to be magnanimous to the trial court, Your Honor. Well, you're here now, and our job is to, there's a clear indication the district court is going down the wrong path to say so. Don't waste time to come back up here and tell them again. Well, that was my point, perhaps made a little more bluntly, Your Honor. I do think given what the court said in this decision here, it's far more likely than not that it is going to do the same thing again. And if, as we suggest, that's incorrect, it would be more efficient to point that out. And so those are sort of the two issues, the key and the least, that I think are, you know, jump out. I could certainly keep on going. I sense that the court's... Again, I don't want to suggest that I know what the court's going to do. I think my client would be satisfied with a hearing. I think it certainly makes the court's ultimate decision in the case easier to have a full record. I am concerned. I don't want to treat it as a concession and that certainly the government had the opportunity to say, we want to put on more evidence. We want to have these issues clarified. And I simply know that typically when I don't do that and it comes up, I get a lot of pushback about, well, you know, you had your opportunity to put this on. It's not our job to solve the problems arising from your decision not to do it. Well stated, Counselor. I appreciate it. You're absolutely right. That's what happens when the government gets a mulligan and you don't. Well, that's why I keep coming back. It's more challenging. But with that, Your Honor, we would, if the court is inclined to send it back, I do think it would be appropriate to give some direction, whatever the evidence may turn out to be, as to what the proper legal analysis to be applied to that evidence is. And since the government certainly has not disavowed the prior evidence in this case, I do think it's appropriate to assume that evidence will be similar and directions on how to address that evidence would not be wasted, Your Honor. So again, I do think that the record is sufficient to dispose of some, if not all, the issues. But if the court is inclined to send it back for a hearing under Rule 8, that some direction to the trial court as to where the analysis should go would be appropriate. Thank you, Mr. Walden. Thank you, Your Honor. Ms. Purcell. Thank you, Your Honor. May it please the court. Good morning. My name is John Purcell. I'm an assistant U.S. attorney in Maryland. I was not the prosecutor who handled this case at trial or the right trial. I did not also handle the 2255. Now, I would like to address... Is there anything in your file that told you why there wasn't an affidavit from the original defense? No, the assistant, actually, the assistant who did this case is now a judge. And I think he felt, as actually I feel, when you look at the issues, and counsel's done a great job glossing the issues, but in terms of, for instance, the issue of error, the defendant, Mr. Jones, is correct when he says that the government could have used, and that's the operative word here, used his testimony. If counsel told him, if you testify, they can use your testimony. Of course, we're aware of Simmons, and Judge Blake was aware of Simmons, and she stated in her memorandum opinion that that use would have been in the absence of any other connections, assuming he loses standing, which we have not heard how he established his standing. I'll address that in a moment. But the lawyer at the trial would have had to put him on. And in the absence of any other connections, unlike Wright, who was caught with a key in the door, so he had no choice but to establish standing. Are you saying the only way he can establish standing is he has to testify? No, not at all. Well, he could have testified. I thought you just said that, that he'd have to testify to establish. That's not true. And he could have testified. It's not the point. No, but he did not have to testify to establish standing. Actually, he probably would have, but he would have had to produce evidence of his link to the, however he did it. He would have had to, whether he testified or not. There's no question that Simmons would have barred the use of his, direct use of his testimony. The point is, is that he had no other connections. There was nothing found linking Jones to the apartment. He didn't have a key. He was just there. And his defense, as this court pointed out in the opinion that came out from the appeal of the case, which is 345 Fed Apps 872, the court there recognized what counsel's strategy was. They also recognized that there was no other connection of Jones to that apartment. There's a way to make that point and convey that to the client without giving him the misadvice as to what the consequences would have been if he had testified at the suppression here. Certainly one can say that counsel may have had one idea of what the word use meant. And Mr. Jones has today a different one thinking that. But we don't know what counsel meant because we don't have any evidence. Well, we know what he did. And we know what his argument was. And we know that as Judge Blake pointed out in her memorandum opinion, if Mr. Jones had tried to establish standing, the only way he could have is by establishing what his link was to that apartment. So he would have had to reveal that he had, like, I'm the lessor. He would have said, we don't believe he's a lessor. But he would have had to say, yes, he could have called Ms. Worthington. He could have just described her as his co-defendant, Mr. Wright did. Wright took the stand and said, yeah, my whole connection to that apartment is that there's a woman named Lene Worthington who allows me to use it. And I stay there sometimes, et cetera, et cetera, after which the government can probably, I'm sorry. I think the point, though, is that it seems like in these scenarios, we're having to guess a lot. And I don't see why we should need to do that on appellate review. Goes back, you have a hearing, you put on the evidence, and that ought to solve most of the questions. There's a certain amount of presuming what people were thinking by what they did. I'll concede that. Though, can I move to the second aspect, and that is standing. And this is why I think, and I can sense, of course, what the court is thinking about doing. Let's go back and fill in the gaps. Now, the gaps, or the question as to what is standing, has been really actually pretty well solidified by the affidavits that have been filed and by the defendant's own petitions. He sets out exactly how he established a standing, which is what he would have testified to, that he had this link, Ms. Worthington, who was his nominee, lessor, et cetera, and that he, therefore, had an expectation of privacy. That's all fine. But what's not in any of the affidavits, the two from Worthington or the defendant's own or his own exhaustive statement of facts in his petition, which is at pages 248 to 251 of the joint appendix, his own petition, he sets out exactly what he would have proven. And the point is, is that neither, our view, is that neither Worthington, under Fourth Amendment law, nor Jones have standing in this Stash House apartment, which is exactly what Judge Blake concluded. No matter what error may or may not have occurred, this defendant nor Worthington can establish standing. The Fourth Amendment, and this is really the core of our big brief, because it really hits about this. The Fourth Amendment protects people in their homes. In their homes are those things, the equivalent of their homes, when they're traveling, as Olson said, you stay at the home of some other person, the place where you're getting shelter, your home. This apartment was nobody's home. It wasn't the defendant Jones's home. His trial record shows he lived somewhere else on the day of this raid, and he lived with a this court's own opinion. You're saying an individual can't have more than one residence? Your Honor, certainly the Fourth Amendment would respect that, but this wasn't a residence for anybody. If you look at the, and nobody suggests that it is. We weren't dealing with the nominee lessee, if he in fact had signed the lease. The fact that this was a Stash House, but there was some testimony that on occasion, one or more of these defendants would sleep on the floor. That's not good enough? This is, it may be good for that defendant, and that defendant was the one that the government conceded. But the defendant, his record shows he was never even there. He never had any expectation in it. And Worthington's link to it is merely as a nominee. She can profess this expectation of privacy in an apartment in which she didn't have a key, she gave the keys away. Her mere connection is that she leased it, she says, for someone else. I've read an apartment. I pay the lease every month, and I stay somewhere else. I have no Fourth Amendment expectation of privacy, even though I don't stay there one night. Is that apartment you're dwelling? If the apartment is not your dwelling. It's a leasehold, and I'm the lease lessee, and I stay in many places around the world, but I never stay there. You're saying I have no Fourth Amendment protection? You might, but Jones doesn't even have that. If you look at the Gray case, that individual Gray, the Fourth Circuit permutation of Carter, that defendant tried to establish, and it wasn't Gray, it was a co-defendant, tried to establish his standing in an apartment. And he said, I stay here, I come here. It was, first of all, his dwelling. That was the first difference between our case and Carter and any other cases. Carter, as the court stated in Carter, this was a residence. This apartment in Carter was a residence. And Gray, much more, Gray left a toothbrush at the place. He kept personal property there. He stayed there on a couple of occasions. He used to go there to watch TV, but that wasn't sufficient for Fourth Amendment protection. And in this particular case, this apartment was merely nothing more than a stash house. There was nothing else done except Wright said occasionally when he was there cutting up heroin, he'd sleep on the floor. And he said a couple of times. There's no evidence, though. Wright said, that's not conclusive in terms of what may happen. What I'm saying, well, I'm saying you're under the record up to this point, has even Jones, but less than that. Jones had an opportunity in his affidavits to say, that's my residence or my other residence. At his trial, he proved he lived someplace else. He called his girlfriend at his trial who said, yeah, he lives with me at one of the other places that was searched where they found money counters and money and a gun, things like that. There's no evidence that he ever was in that place, used it for any purpose, was ever inside it and particularly didn't use it as a residence nor anybody else. Do you have to spend the night or can you just be there for X number of hours? It has to be a residence. It has to be a place for Fourth Amendment protection. I'm not talking about whether you have to pay the bill for the lease. I'm talking about whether you get Fourth Amendment protection. It has to be your dwelling, your home. The Fourth Amendment protects your home. And I was attending a lecture the other day. You have no Fourth Amendment protection in your hotel room? Of course. Absolutely. Because now that's your dwelling. My hotel room down the street is my dwelling right now. That's your dwelling? You just stayed there overnight. For the Fourth Amendment purposes, it's my dwelling. Yes. It's my home right now. I'm away from home. So then if you didn't sleep there at all that night in the hotel room, you would lose it. That's your theory. I'm talking about the technological extent of your argument. That's not what I said. Let me finish my question. I'm sorry. So if you rent the hotel room, check in, and just walk out, and go downtown, and spend all night long out, you have no protection, right? Not at all what I said. That's not at all what Olson said. I'm trying to follow you. You said, how is it your dwelling? You rented the hotel room. You didn't stay there overnight. What's the dwelling part? Your Honor, for the Fourth— What's the dwelling part beyond just renting the room? Fourth Amendment purposes, when I rent a hotel room, which is actually a room for—as a resident, I will have standing in that room as long as I use it. If I'm not using it, the lease runs out, I don't pay it, it's gone. But there are many, many cases on that particular point. Well, when you say use it, what does that mean? They were using it here. Use it in a way— And that's an important part, because the United States versus—Minnesota versus Carter looked at exactly that point and said, wait a minute, you're not using this as your dwelling. You're using it for a commercial purpose, for a stash house. So yes, Your Honor, if I come down here to Richmond and decide I'm going to get a room in a nice government-paid hotel, I'm going to make it into a stash house, and that's what I use it for, I'm not going to have Fourth Amendment protection there. And that's what Carter was about. That's what Gray was about. Now, in those cases, those defendants at least had some connection to the apartment. And my point here is that the Fourth Amendment protection for a person in their dwelling, Mr. Jones hasn't begun to show anything. Now, I don't know that he'll be able to show any more, because he's constrained by the affidavits and those of Worthington, which put no connection, none, of him to that location. Well, the fact that he lived someplace else doesn't necessarily mean that he couldn't testify that on occasion. I spent the night at this apartment. He can testify to that, but that's not something that is in the record so far in the affidavits that he's presented or in the petition that he filed. He never says anything about being there. And he seems to be very careful in his petition about what the strength of his connection is. And he puts it all on this lease, that, therefore, I actually told her to do that, so I'm the leaseholder. And, Your Honor, he puts a lot of the argument is like, it's sort of presumed that I'm the leaseholder, I have standing. Not the case. If you're a leaseholder in a residence... If it goes back for an evidentiary hearing, Mr. Jones wished to testify to the fact that he could, that we'd know. He could. He'd be contradicted. I'm sure I can tell you what Judge Blake will do. The opinion will be almost exactly the same, and we'll be back here again. And I understand what you're suggesting, Your Honor, and that's fine. But my point is, on the record... Be careful when you say that, because that's exactly what counsel's talking about. Maybe we should preempt that. You say we have the exact decision we had before, we'd be right back again. Did you say that? I think that what's going to happen if we go back is that when the record is complete... I don't know there's that much more you can add to the record, Your Honor, because the record from his trial has him living someplace else, and the record in his petition and the affidavits he's presented establish no link. He's never been in the place, never had a key, never stayed there for a minute, went in the door, anything. His whole connection is nothing. So I don't know how he can expand that below. If he doesn't expand that below, then the court will find that he has no expectation of privacy under the Fourth Amendment. He will lose the 2255 hearing, and he'll appeal again. But my point is to consider this not so much under the error aspect, which I don't think occurred. I think there was a misunderstanding, well-exploited misunderstanding as to the word use, that's been turned into a Simmons argument, and that's what counsel's paid to do. But that's not what the judge saw happening, and she was right there. Well, if you get the affidavit or the testimony of the trial attorney, you don't know if he'll say, oops, I messed up. Yeah, I pulled him, forgot about Simmons. I appreciate that there's a gap in the record in terms of the trial attorney. And that's something we can, if it goes back, that we can explore, wasn't explored at the time, at least with an official affidavit. Though, as I've said, I think that the real misunderstanding here is I know, or you can see or infer as lawyers what he was thinking and doing by the strategy he took. Mr. Wright was in a very different position, as we note. He had the key in the door. He couldn't say, I have no connection to this place. And he was fortuitous in that at the end of the day, this was a bad search. That was an ill-applied emergency exception by the police who would go into this place. But our point is that under the Fourth Amendment, which protects our residences, however they may, wherever they are, and they may be many, and they can be fluid. But this was not a residence for anyone. It wasn't certainly a residence for Jones or even by extension for Worthington. She doesn't have in her affidavit she's ever been there or did anything other than sign a lease. That does not convey on Jones or anybody else Fourth Amendment standing. And our position is, and our request of the Court is to find that in terms of prejudice, and in many cases say, and you see them, Your Honors, is that if the prejudice aspect, the prejudice prong provides the answer, that there's no prejudice, that we need go no further. I'm sorry. And in this particular case, the record suggests that Jones will never be able to establish standing. We haven't yet heard how he intends to do so. We haven't heard a proffer. We haven't heard a suggestion. But based on the proffers, I'm sorry, the affidavits and his own petition, he's gone as far as he can go to establish what he would have shown the Court to establish standing. And it isn't nearly, nearly enough, as Judge Blake correctly decided at the time. Though the confusion over the use of the word, use in an application of Simmons has been well exploited here. But Judge Blake saw... Counselor, your problem is, the fallacy in your argument is that you're judging the affidavit of a different standard. Affidavit is simply enough at this point to establish the two prongs of Strickland. The evidentiary hearing, the evidence that will be due to that trial, at the hearing, which we don't know what it will be, will be to win the suppression motion. That's a different standard. Your Honor, you are absolutely correct on that. It's certainly possible he could have put more in the affidavits than he thought is necessary. But I will just point out again that in the trial... He could have put less in that he had. That he could have put less in his petitions, yes, in his affidavit, yes. He could have. But yeah, exactly the same thing, I think. This looked at different ways. But as I say, the trial record sort of has him constrained because his own witness at his trial, and her name is Ms. Covell, and her testimony is at 358 to 362 of the joint appendix. She was called at his trial, and she said, yeah, Mr. Jones is... And this isn't Worthington. This is a different girlfriend. On the day of this raid, he was my boyfriend. He lived with me at my apartment called Ruddasil, which was also searched that day. And so she had... She establishes that he didn't live there either, as well as Worthington's... The gaps in Worthington's affidavit. He obviously may have spent most of his time there with her, but that doesn't exclude the possibility that he spent time elsewhere. The possibility that... That's a possibility he would have to, as you say, supplement at the hearing. He certainly didn't put that in his what appeared to be carefully drafted affidavit. We understand that point. I think you've made that point. Yes. But it's not there yet, and certainly he could. And if that were established... And my last point on that, Your Honor, is that even if he did say, I went there, what we can't get away from here is this is not a residence. So far, the record is clear that it's not a residence. It's just purely a stash house. So it doesn't get the benefit of Fourth Amendment protection that a dwelling, that a home does, according to all the Fourth Amendment cases, including Carter. What if there had been a bed there and they actually spent the night there on a number of occasions, but it still was... I mean, they were selling drugs out of the house. Different facts. Certainly, one does not mutually exclude the other, and I definitely understand that. But in this particular case, you would have to show that it is his dwelling. Gray is an example of a person who's going to a place that's a stash house, but as the court found in Gray, this court found, his primary purpose was commercial, not using it as his home. And I would just ask the court to look at those cases, look at Carter and Olson, and how they define what is our home, whether it's our home away from home, or our other home, or our hotel home. Home has been expanded, but it's always that place that we are, not just where we happen to go and take a nap or spend some time. It's our home for the purpose of the Fourth Amendment. It gets that protection. And that's what this place was not for anybody, and particularly not for Jones. Thank you, Your Honors. Unless there are any other questions. Thank you. Thank you. Mr. Walters, you reserve a few moments. One important point here, I feel compelled to make, is the Fourth Amendment doesn't just protect homes. I was about to say that too. I was listening to him talk about cars, a lot of things. We cited that it protects U-ranked storage lockers. John's case we cited is that all the meth chemicals are in the storage locker, and the court never mentions, oh, it wasn't a residence or a home. The question is, is there a subjective expectation of privacy that society is prepared to accept as being objectively reasonable? That extends to cars, garages, U-store of lockers, all those types of things. It's also, the last two points I want to make are important. What this court emphasizes in Gray, and it derives from Carter, is it's the relationship between the owner, lessor of the property, and the defendant. It's not the business nature of the premises. It's what was the personal, if you read Gray, it talks over and over about the relationship between Askew and Gray. If you look in Carter, the Supreme Court talks about these people never met Ms. Thompson, the owner of the unit, before they had just come down from Chicago for the first time. The record here is that Worthington and Jones had a substantial personal relationship that had nothing to do with the business of drug transactions. So it's not, is the premises used for business purposes? It is the relationship, a business one, a personal one. So the Fourth Amendment protects places, even if they are not residences. Gray and Carter say it's whether the relationship between the person who has nominal control of the property and the person who is visiting it is a personal or business relationship. And even if it is a business premises, it's not that there are no Fourth Amendment protections. So those are all questions that are not going to be despised as saying, oh, well, Judge Blake found it was just a stash house. That doesn't answer the question. The question is, even if it is a stash house, as this court acknowledges in Gray, I can be using my house to run a drug operation. It's still my house. I'm still protected. And Gray, the court said, clearly Gray can assert his Fourth Amendment rights here. So I think it's wrong to go down the path of it only protects residences. And it's wrong to say, even if it's not a residence, even if a business transaction is going on there, that that's the end of the analysis. It's the relationship question. It's the relationship between the parties. So for those reasons, we'd ask that it be reversed or be remanded for further evidential hearing. Thank you, Mr. Walters. I note that you're a court opponent, and I want to give special thanks to you. We appreciate you taking these cases. It's been an incredible service and valuable service to our court. We appreciate that very much. And obviously, Mr. Purcell, thank you very much for ably representing your client as well. We'll come down to recounsel and then move to the next case. Thank you.
judges: Roger L. Gregory, G. Steven Agee, Albert Diaz